STEVE BATSON v. THE STATE.

*No. 1423.    Decided December 22nd, 1896.*

1.  Evidence—Witness—Convicted Felon.

Where a witness has testified and it is subsequently shown by parol evidence that he has been convicted of a felony and the issue is then made as to his disqualification, and the court admits the parol testimony with the announcement that such evidence will go merely to the credit of the witness and refuses to exclude the testimony already delivered—there is no error. Distinguishing the case of White v. State, 33 Tex. Crim. Rep., 177.

2.  Same—Postponement or Continuance to Obtain Record of Conviction.

On a trial where it was discovered on cross-examination of a witness that he was a convicted felon who had served a term in the penitentiary, and had never been

pardoned, and defendant suggested that a postponement or continuance should be had until the record of his conviction could be procured from the county in which he had been convicted, but filed no written motion to postpone or continue setting out the fact that the matter was newly discovered and the diligence which had been used to discover it. Held: That the question of postponement or continuance was not properly presented for review.

### 3.   Evidence—Hearsay—Harmless Error.

Where B., a witness for the State, has already testified without objection, that he related the facts sworn to by him to one Mc. on the night of the murder, and Mc. being placed upon the stand testified that B. had related the matters to him on said night in substance the same as he had testified and it was objected that Mc.'s testimony was hearsay. Held: If error, the error was harmless.

### 4.   Murder—Evidences of the Crime Discovered Through an Accomplice.

On a trial for murder, evidence of the finding of deceased's hat and rope and tracks and blood spots was not rendered inadmissible on account of the fact that a confessed accomplice was present when these things were found, nor the fact that he did assist and point out these evidences of crime. These evidences of crime tended strongly to corroborate the accomplice.

APPEAL from the District Court of Madison.   Tried below before Hon. J. M. SMITHER.

Appeal from a conviction for murder in the second degree; penalty, forty-five years' imprisonment in the penitentiary.

The indictment charged appellant with the murder of Willis Davis, on the 14th day of April, 1896, by hanging him by the neck with a rope and shooting him with a gun.   On the fourteenth day thereafter, viz: on the 28th of April, 1896, appellant was convicted for the murder with penalty as above stated.

The following are the material facts as shown on the trial of the case:

Jake Bledsoe testified: "I knew Willis Davis; he was sometimes called 'Nine' or 'Nine Spots,' as a nickname.   Willis Davis is my stepson.   He and I were working for Mr. McIver, across the river, and came over here to cut and haul wood for him on Monday, the 13th, and were working about three miles from town on the Madisonville and Rogers Prairie road.   I hauled a load of wood to town on Tuesday morning and then went back for another.   Willis was chopping where I left him.   We put on a load and came back this way across the slough bridges where I showed Willis a tree to cut which was about one hundred yards from the road.   I then started on to town and met Steve Batson and a young man just a little way below the old slough bridges, not out of hearing distance from Willis.   Willis came up while we were talking and asked for a match.   Batson shook hands with him and said, 'Hello! "Nine," where in the h—l did you come from?'   Willis said he was here working for McIver.   Batson said: 'I had said that if ever I met you again I would kill you, but guess I'll not do it now.   Besides, if I wanted to, I have nothing to kill you with' (or words to that effect). We talked a little more and then separated, and did not notice them further.   I came on to town and left here to return about 12:30.   It took me about 45 minutes to get back.   Willis was not there, and I looked around for him.   The axe and saw were there.   Willis was about twenty-two years old, and had lived on Sand Prairie three or four months during

the last two or three years. He wore a white or dove colored hat. (Here witness was shown a hat and identified it as the one Willis wore.) I continued hauling wood that day and when I came in at night I told Mr. John McIver about Willis being gone. I also told Mr. McIver about Steve Batson and the other young man coming along and told him what passed between Batson and Willis Davis. I told him that night and also the next morning. I had no idea Willis had been killed. I thought he had gone back to Houston County. I continued to haul wood until Friday, and then went back over the river with Mr. McIver. After I left Willis on Tuesday morning I never saw him any more until the next Tuesday morning. I saw him in a box here in Madisonville, dead."

Jim Bell testified:' 'Steve Batson is my uncle. I came to town with him on Tuesday, the 14th of this month. We left town about 12 o'clock, going out on the Rogers Prairie road. We met Jake Bledsoe near the slough bridge with a load of wood, and stopped and talked with him. Willis Davis walked up while we were talking. Uncle Steve called him 'Nine spot,' and said: 'Where in h—l did you come from?' The negro said he was chopping wood for Mr. McIver. Batson said: 'I have promised myself that the next time I saw you, I would kill you, but will let it pass, besides I have nothing to kill you with.' We went on, leaving 'Nine' talking to Jake. When we got to the next bridge Uncle Steve said: 'It was a d—n good thing I didn't have a pistol.' He asked me if I had one, and I told him no. He kept insisting, and then I admitted having one. He kept after me for it, and I gave it to him, because I was afraid I'd get into a row with him. We then went back to where the negro was cutting wood, about one hundred yards from the road. Batson asked 'Nine' for the axe, but the negro wouldn't let him have it. Batson drew his pistol and 'Nine' ran around my horse. When he stopped, Batson told me to tie his hands. I cut a piece off the rope on Steve's saddle, unraveled it, and with one of the strands tied his hands. We carried the negro to the upper end of the lake. We made him get up behind me on Batson's horse. Batson got on my horse. We went to a pasture and entered where a tree had fallen on the wire. We then went about one-half a mile, going up the creek, where we saw a field fence about one hundred yards off, and stopped. Batson rode up to the fence, and saw no one. When he returned he said: 'We've gone far enough.' 'Nine' said: 'Oh, Lord! I believe I am going to die right here.' Batson said: 'Oh, yes, it hurts you; but don't hurt you half as bad as it hurt me that time I sent you down in the field after a clevis, and when I came down you was behind a stump snapping a pistol at me.' The negro told him the pistol wasn't loaded. I tied a hangman's knot, and Batson put the rope around 'Nine's' neck. We then helped him on the horse and in the saddle. Batson asked the negro if he wanted to pray. He prayed some time. Then Batson led the horse to a little tree and put the rope over a limb. I then led the horse from under him. He choked and struggled about fifteen minutes. He hung about twenty

minutes, when Batson shot him twice.   Then we let him down, cut the
rope off his hands, took the rope off his neck and looped it around his
hands.   Batson got on his horse and dragged the body to the water,
where we rolled it in and threw the long rope into the water.   I took
the short pieces of rope and 'Nine's' hat, and put them in Steve's saddle
pockets.   We went on up the creek and threw the rope in a hole of water.
I put mud into the hat to sink it.   We went out of the pasture at a gap
where a strand of wire was down.   We struck the Rogers prairie road
near Brushy Creek.   We met Dan Cole, and saw Witt Etheridge plow-
ing, and Lott Crouch.   I stayed all night with Batson.   I think it was
between 1 and 2 when we killed the negro.   After reaching the road,
Batson said, that if I ever told this he would kill me; and, if he was con-
victed because of me telling it, he had two boys who would kill me.
(Here witness was shown the hat and rope, and identified them).   He
had the long piece on the saddle, one end around the horse's neck, and
he had no other rope.   The place where we hung and shot the negro,
was about forty yards from the hole of water we threw him in, by the
the side of an old road.   The rope the negro was hung with, was thrown
in the same hole we put the negro in.   We carried the hat and short
pieces about one-half or three quarters of a mile up the creek, and
threw them into a hole of water.   It was about two or two and one-half
miles from where the negro was cutting wood to where we killed him.
After throwing the piece of rope and hat in the water, we went on up
the creek, and struck the Rogers prairie road about five miles from Mad-
isonville.   Dan Cole was the first man we met; we stopped and talked
with him a few minutes.   Willis Davis, the party Steve Batson and
myself killed, was killed on April 14th, 1896, in Madison County, Texas.
I did not know the negro, Willis Davis, and never saw him before that
day.   When we got back to the road we went on to Batson's house, and
got there about an hour by sun, in the evening."

J. R. McIver testified:   "Jake Bledsoe and Willis Davis worked for
me; and, on Tuesday the 14th, they went out, to chop and haul wood,
about 8 o'clock.   Never saw Willis again until I saw his dead body the
following Sunday.   Jake told me on Tuesday night that Willis was
gone, and I supposed he had run away.   Jake told me of meeting Bat-
son and the young man, and what had passed between them all.   Willis
was commonly called 'Nine.'   I saw where 'Nine' was killed; saw the
rope marks on the tree, saw the blood on the ground and marks where
something had been dragged to the water.   I had but little suspicion,
when Jake told me of meeting these parties.   I had wood nearer to
town, but put the negroes to cutting out there because there were tree
tops I wanted cut up, and a better road for hauling.   (Witness identi-
fied hat produced in court by F. M. Black, as the hat of deceased, Wil-
lis Davis.)   I brought Jake Bledsoe and Willis Davis over here from
Houston County on Monday, the 13th of April.   They were living on
my place in Houston County.   Dave Cannon, Jake Bledsoe and myself
went to the hole of water where the body of Davis was found, and I

had Bledsoe to go into the water and look for the rope that the negro was said to have been hung with. We found it in the water. (Here witness was shown a rope about twenty feet long, about one-half inch in diameter, with hangman's knot and a loop in one end, which was identified by witness as the rope found in the hole of water.) The rope was in the same condition it is when we got it out of the water. It has been in my custody ever since. We found the rope on Wednesday, the 22nd, the Wednesday after the negro was killed. Jake Bledsoe told me what had occurred on the road between Batson and Willis Davis when he came in Tuesday night; he told me again about it the next morning, in the presence of Jim Ewing. On the next Friday Bledsoe and myself went back to my place in Houston County. We came back on Sunday the 19th, and I saw Willis Davis in a box on the square, in Madisonville, dead. It is about two or two and one-half miles from where Davis was at work cutting wood, to where he was found dead, in the water."

F. M. Black testified: "I am sheriff of Madison County. On Saturday, April 18th, I was called on to go out to Cameron's pasture, where a dead negro had been found. I went out, and found the body in a hole of water, lying on its back, with hands over its head. The tongue was protruding from the mouth. We pulled it out of the water and brought it to town. The body was that of Willis Davis, sometimes called 'Nine.' From where the body was found, there was a drag that led out about forty yards. Where the drag stopped, was by the side of a road that led from Dave Cannon's house to his field. It was about one hundred yards from this place to a field. I found the tracks of two horses at this place. One a small track and one a large track. One of the feet of one of the horses seemed to have had a piece broken out of one side. One of the horses had been hitched on the right hand side of the road at this place. I found a short strand of new rope and a knot that seemed to have been cut off. I also found blood on the ground, and blood on a stump, where it appeared as if some party had wiped or scraped his hand on the stump. There was a horse track on the drag that led to the hole of water, and the drag was over the tracks which sorter wiped them out. On Sunday, the 19th, I went back to this place to do what tracking I could, and followed the tracks of the two horses from the place up the creek about three-quarters of a mile. There were quite a number of horse tracks crossing over the trail, but the tracks of these two horses kept a direct course up the creek. On Tuesday, April 14th, Jim Bell and Steve Batson were in Madisonville. Batson was drinking. He was creating a disturbance in Evans' saloon, about 11 o'clock. I went in and told him to keep quiet. He said he would hush when he got ready. I told him I would put him in jail if he did not, and he remarked, 'That places a different light on it,' and he then hushed. He went from there to Harrison's restaurant, where he created another disturbance. Jim Bell and Steve Batson left town for Roger's Prairie about 12 o'clock. On Monday, April 20th, I ar-

rested Jim Bell and placed him in jail.  Batson was then on trial in the O'Neal case.  I did not allow Batson and Bell to see or communicate with each other.  The next day Bell made a statement before the grand jury, relating what he and Batson had done, and telling where the rope and hat were.  I sent John McIver, Dave Cannon and Jake Bledsoe out to the hole of water, where the negro was found, to look for the rope.  In a day or two I, with one or two others, took Bell out to the place where the negro was killed.  I examined the tree, where he was said to have been hung, and found where a rope had apparently been thrown over a limb.  I judged this by the evidences on the bark of the tree.  We went on up the creek about three-quarters of a mile, and Bell showed us a hole of water where, he said, he and Batson threw the hat and short pieces of rope.  I had a negro to go into the water, and found the hat and short pieces of rope.  The hat was sunk.  (Witness was here shown a hat and several short pieces of grass rope, consisting of several strands of rope apparently from a half-inch rope, all of which were identified by witness as that found in the hole of water; witness also identified a strand of grass rope apparently from a half-inch rope, as the piece found by him at the place where Davis was killed.)  On the day I arrested Bell, he and Batson rode into town.  One was riding a small and one a large horse.  One part of one of the horse's hoofs showed by its track that a piece had been broken out of it."  Cross-examination:  "I have had some dealing with crazy persons.  I have had persons perfectly insane to obey me, just as Batson did, by threatening to put them in jail.  Jim Bell is indicted for the same offense that Batson is on trial for.  When I first went to the place where deceased was found, there was quite a crowd there.  Bell was with me the day I saw the sign on the tree, and found the hat and pieces of rope in the water.  Batson was pretty drunk when he left town."

Defendant's bills of exception, which are discussed in the opinion of the court, were to the following effect:

The State introduced the witness, Jake Bledsoe, to corroborate the testimony of Jim Bell, a confessed accomplice to the murder of deceased.  After witness had testified to facts seeking to connect defendant with the commission of the offense charged, the defendant was permitted without objection, to elicit from him, for the purpose of showing his incompetency, that he had been tried, convicted and sentenced from Kent County, Texas, to the State penitentiary for felonious theft, had served out his full term and had never been pardoned by the governor.  Said witness testified in behalf of the State, that on the day deceased was missing, and was said to have been murdered, that he was hauling wood and met the defendant in company with a young man about half past 12 o'clock in the road about three miles from town near where deceased was chopping wood.  That while he had stopped and was talking with defendant, deceased walked up and spoke, and defendant spoke and shook hands with him, and then said, "what in the hell are you doing over here; I had promised to kill you and would do

it now but haven't got any thing to kill you with." After remaining a short while deceased returned to his work, and defendant and the young man with him started on their road toward home, and "I came on to town with my wood, and when I went back after the next load deceased was missing." To all of said testimony introduced in behalf of the State, defendant objected and moved the court to exclude it from the jury, which was refused by the court, and permitted said testimony to be considered by the jury, to which ruling defendant then excepted and reserved his bill of exceptions.

J. R. McIver testified that Jake Bledsoe told him, on the night after Willis Davis, the deceased, was killed, that, on the same day about half past 12 o'clock about three miles from Madisonville on the Rogers Prairie and Madisonville road near where deceased was at work chopping wood for him (McIver), he met defendant in company with a young man in the road, and that while he had stopped and was talking with them deceased came up and spoke to defendant and they shook hands, and defendant asked deceased what he was doing over here, and told him that he had promised to kill him at one time and would do it then but didn't have anything to kill him with. That he (Bledsoe) came on to town, and defendant and the young man with him started on towards their home. That deceased was missing when he went back after his next load of wood. That deceased had been chopping wood about 100 yards from the road. Jake Bledsoe testified that deceased was missing about 2 or 3 o'clock p. m. There was no attempt made by defendant to impeach the witness, Bledsoe, by showing any contradictory statements made by him on the witness stand or elsewhere. To which above testimony by McIver detailing said statements made to him by the witness, Bledsoe, on the night after the alleged homicide, the defendant objected at the time it was offered. The court overruled the objections of defendant and permitted said testimony to go to the jury, to which ruling of the court the defendant then excepted and reserved his bill of exceptions.

The witnesses, J. R. McIver and F. M. Black, testified that they, in company with and under the direction of the witness, Jim Bell, who is under indictment for the same offense, went to the place where the body of deceased was found on April 23rd, 1896, after said Bell had turned State's evidence, and said Bell pointed out to them the place in the pond of water where they might find and did find a rope which the said Bell asserted was the rope with which the deceased had been hanged; also, showed them a snag on a dogwood bush near by, also being near a pool of blood which the said Bell pointed out to them as the place where deceased was hanged and shot. Said Bell, also, conducted them, said Black and McIver, to a pond of water about three-quarters of a mile up Caney creek from the place where the body of deceased was found, and told them that they would find in said pond a hat worn by deceased at the time of the homicide, and also, some pieces of rope with which deceased's hands had been tied. Witnesses both testified that they

found a hat and pieces of rope in said pond as the said Bell had told them. The witness, Black, testified on cross-examination that defendant, Batson, was not with them and knew nothing of their search or investigation, which testimony was objected to because defendant was not present at the time.

*J. M. Brownlee* and *T. J. Ford*, for appellant.—The court erred, upon motion of defendant, to withdraw the witness, Jake Bledsoe's testimony, in refusing to withdraw from the consideration of the jury the testimony of said witness, Bledsoe, because said witness was an unpardoned ex-convict, and not a competent witness.

The witness, Jake Bledsoe, who was introduced by the State, and upon whom the State relied for evidence to corroborate the testimony of the confessed accomplice, Jim Bell, who is an unpardoned ex-convict, was wholly incompetent to testify in said cause; and, therefore, when defendant, on presentation of the State of said witness, was permitted, without objection, to elicit from him, for the purpose of showing his incompetency, that he had been tried, convicted and sentenced to the State penitentiary for felonious theft, had served his full term, and had not been pardoned by the governor, he should be held incompetent, the right to have his conviction shown by the records thereof being waived by the State. White v. State, 33 Tex. Crim. Rep., 177.

The court erred in refusing to postpone the trial of the above cause to some future day of the term, upon motion of defendant to postpone said cause to some future day of said term for the purpose of obtaining and giving him time to procure the District Court records of Kent County, Texas, to be used as evidence in said cause showing the trial, conviction, and sentence of said witness, Jake Bledsoe, to the State penitentiary; all of which was confessed by said witness, Bledsoe, elicited from him by defendant.

After the witness had testified to material facts upon the trial in behalf of the State, and the defendant was permitted, without objection, to elicit from him, for the purpose of showing his incompetency, that he had been tried, convicted and sentenced to the penitentiary for felonious theft, and having serving out his full term, and not having been pardoned by the governor, it was the duty of the court to exclude the testimony of the witness from the consideration of the jury; and, refusing to do this, upon the ground that the record testimony was the best evidence, then, upon motion of defendant, the court should have postponed the trial of said cause to some future day of the term in order to give him time to procure the record testimony from Kent County, Texas, showing the trial, conviction, and sentence of said witness to the State penitentiary from said county, the knowledge of witness being an ex-convict having been obtained for the first time by defendant, when introduced as a witness in said cause by the State.

The court erred in permitting the witness, J. R. McIver, to testify to statements made to him by the witness, Jake Bledsoe, on the night

after the alleged homicide, tending to connect the defendant with the murder of deceased; said statements so testified to not having been made in the presence of the accused, and no attempt having been made to impeach said witness, Bledsoe, by showing contradictory statements made by him; such statements made to said McIver and detailed by him upon the witness stand being hearsay testimony.

The testimony of J. R. McIver, detailing statements tending to criminate defendant, made to him by the witness, Jake Bledsoe, on the night after the alleged homicide (which occurred about 2 o'clock p. m.), not in the presence of the accused, and no attempt having been made to impeach the witness, Jake Bledsoe, by showing any contradictory statements made by him, was hearsay, and for that reason not admissible. Riojas v. State, ante p. 182, and cases there cited; Reeves v. State, 7 Tex. Crim. App., 276; Belverman v. State, 16 Texas, 130; Holt v. State, 9 Tex. Crim. App., 572; Felder v. State, 23 Tex. Crim. App., 477; Bennett v. State, 36 S. W. Rep., 947.

The court erred in permitting the witnesses, Black and McIver, to testify to articles of clothing, rope, etc., found by them under the direction of the witness, Jim Bell, and not in the presence or within the knowledge of the accused, Steve Batson, because said testimony was irrelevant, and did not tend to connect the defendant, Batson, with the commission of the offense charged, and tended to prejudice the jury against the defendant.

Where the State relies on corroborative testimony for a conviction, the testimony relied on must at least in some degree tend to connect the defendant with the commission of the offense for which he is on trial; and to do this, the circumstances or facts testified to must be shown to have connected the defendant with the commission of said offense by some other person than the confessed accomplice. Any testimony not tending in some degree to directly and immediately connect the defendant with the commission of the offense charged, and without the aid of the accomplice's testimony, is irrelevant, and therefore, not admissible. Code Crim. Proc., Art. 741; Conway v. State, 33 Tex. Crim. Rep., 327; Crawford v. State, 34 S. W. Rep., 927; Patterson v. Commonwealth, 5 S. W. Rep.; 387; Martin v. State, 36 S. W. Rep., 587; Hoyle v. State, 4 Tex. Crim. App., 239; Jones v. State, Id., 529; Roach v. State, 8 Tex. Crim. App., 492.

*Mann Trice*, Assistant Attorney-General, for the State.

[No brief found with the record.—Reporter.]

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and given forty-five years in the penitentiary, and prosecutes this appeal. It appears from the record that on the 14th of April, 1896, appellant, Steve Batson, in company with one Jim Bell, left Madisonville, to go to the home of appellant, some ten miles distant. On the way they met a negro by the name of Bledsoe, and another negro, Will

Davis (the deceased), in the road. They stopped, and some conversation ensued. The defendant remarked to Will Davis that he had promised he would kill him the first time he met him, and that he would do it now, but did not have anything to kill him with. It does not appear that Davis said anything in reply. Davis was cutting wood for one McIver, not far from that point. After remaining a little while in the road, the parties separated, the negro Bledsoe, driving his wagon on towards town, Will Davis going off to where he was cutting wood, and the two men, Batson and Bell, going on towards the home of the former, several miles distant. The negro, Will Davis, did not return to the home of his employer that night. Subsequently, on the 18th of April, his body was found some two miles from where he was cutting wood, in a pool of water in the creek. It was ascertained that he had been murdered, and an investigation set on foot, which resulted in the arrest of appellant and Jim Bell. Bell turned State's evidence, and related the circumstances of the killing. He states that after they left Bledsoe and Davis in the road, and had traveled a short distance towards the home of Batson, Batson stated that if he had anything he would go and kill that negro, Will Davis, and insisted that Bell had a pistol, and finally induced Bell to give him the pistol and go back with him. They then turned back and went to where Davis was cutting wood. One of them presented the pistol at said Davis, and the other tied him with a rope, made him get up behind Bell, and they rode some distance through the woods, and then hanged the negro to the limb of a tree. While he was hanging Batson shot him twice with the pistol. They then dragged his body to the creek, and threw it in (where it was subsequently found), taking the rope and hat of the negro and throwing them in another pool further up the creek. There was testimony of various witnesses tending to corroborate the witness, Bell, and to connect defendant with the homicide.

The first question presented for consideration is the action of the court in regard to the witness, Jake Bledsoe. After he had testified in chief for the State, on cross-examination by the defendant, he stated that he had been in the penitentiary; that he was sent from Kent County, Texas, for theft; had served out his term, and had never been pardoned. The bill of exceptions shows that appellant objected to his testifying in the case, on the ground that he was an incompetent witness. The other bill of exceptions as to this witness shows that, after he had testified in chief, on cross-examination he stated that he had been in the penitentiary; was sent from Kent County, Texas, for theft; had served out his term, and had never received a pardon. Appellant thereupon made a motion to exclude his testimony. On the refusal of the court to exclude it (the court stating that he would charge the jury in reference thereto), he then moved to postpone or continue the case until he could get a certified copy of the conviction of said witness from Kent County, which the court refused, and he reserved his bill of exceptions. In White v. State, 33 Tex. Crim. Rep., 177, to which we are referred by counsel, where the proof was made by parol that a witness introduced by the State had

previously been convicted of a felony, and had not been pardoned, it was held "that on such parol proof he was rendered incompetent; that it was the duty of the State to make a timely objection to such mode of proof; but, if it was admitted without objection, that the witness was thereby rendered incompetent." In that case the court say: "Had the State interposed objection to the mode of proving the incompetency of the witness, the court would doubtless have sustained the objection, because the conviction of a witness for an infamous crime cannot be proved by a witness on his voir dire, he not being bound to answer, nor would his answer be the best evidence of which the case was susceptible. Cooper v. State, 7 Tex. Crim. 'App., 194; Perez v. State, 8 Tex. Crim. App., 610. But it does not follow that the opposing side may not waive this right, and permit the admission of inferior evidence to prove the fact. The competency of the witness being the issue, upon objection urged it was held that the records must be produced, or their absence properly accounted for, before other evidence could be resorted to to show such incompetency. Perez v. State, 10 Tex. Crim. App., 327. But it seems that this rule does not apply when the credibility of a witness is only attacked on cross-examination, and in that case he may be compelled to answer as to his previous conviction of infamous crimes." In above case it appears that the examination of a witness by parol as to his previous conviction of a felony was made before he testified in the case; that no objection was made to that character of proof; and the fact being established in that manner, on objection the court held that the State had waived the matter as to the character of proof, and held the witness incompetent. But in this case the witness had already testified, and on cross-examination it was elicited from him that he had previously been convicted of a felony, and then for the first time objection was made to his competency. The bill of exceptions shows that such testimony was allowed by the court, as stated at the time, to go to his competency, and not to the exclusion of his evidence; and the court so instructed the jury. We believe this case is distinguishable from the case of White v. State. At any rate, we hold that, where a witness has testified, and it is subsequently shown by parol evidence that he has been convicted of a felony, and the issue is then made as to his disqualification, and the court admits the parol testimony with the announcement that such evidence will go merely to the credit of the witness, and refuses to exclude the testimony already delivered, that there is no error.

The next question on this branch of the case is as to the motion of appellant to postpone or continue the case until the record of conviction of the said Bledsoe could be obtained from Kent County. So far as the record discloses, this was merely a suggestion in the nature of a motion to the court. There was no written motion to postpone or continue, showing the fact that the former conviction of the said witness was newly-discovered evidence, and further showing that diligence had been used to discover the fact that said witness had been previously convicted of a

felony. For aught that appears, by the use of the least diligence appellant might have ascertained that said witness had formerly served a term in the penitentiary on a conviction for felony. If such a motion had been presented to the court at the proper time, showing such newly-discovered evidence going to the disqualification of an important witness, the same might have been cause for a postponement or continuance of the case. But that question is not now before us. We would merely be understood as holding that the question was not properly presented. It appears by bill of exceptions No. 3 that the State was permitted to prove by McIver that the witness, Jake Bledsoe, related to him, the night of the 14th of April, the substance of the same matters testified by him on the trial. This was objected to upon the ground that it was hearsay evidence. In this there was no possible harm to the appellant. Without any objection whatever, Jake Bledsoe had already testified that he related the same facts as sworn to by him to McIver that night (April 14th). Let us suppose that McIver had not been permitted to testify that Jake Bledsoe had told him, Bledsoe having sworn that he had related the matter to McIver. McIver was in attendance upon the court, and, if this was questioned, certainly appellant would have had the right to impeach Bledsoe by proving by McIver that he had made no such statements. If appellant had objected to Jake Bledsoe stating that he related the facts to McIver, quite a different question would have been presented. But without objection this matter was all before the jury, and we are of opinion no harm was done. We do not understand the shape of this question as presented to come within the rule laid down in the case of Riojas v. State, ante p. 182, and other cases. The character of the testimony is objectionable, and not the competency of the witness; and, as Bledsoe was permitted to relate the same facts, we can see no harm that they were reiterated by another witness. If appellant had objected to any of this testimony on the ground that Bledsoe had not been impeached, under the authorities we think his position would be correct.

It is objected that when the hat, rope, tracks, and blood spots, etc., were found, Bell, a confessed accomplice, was present with those who made the discovery. Let us suppose that Bell had not been present, certainly the discovery of these evidences of crime would have been admissible, and could have been proved by any witness having knowledge of them. The presence of Bell did not render this evidence inadmissible, nor the fact that he did assist and point out these evidences of crime. It is true that they did not tend to criminate appellant, but they tended very strongly to show that Bell was present when this murder was committed, and that he had not manufactured that part of his story. It is in evidence by other witnesses that Bell and appellant were together, that they were on horseback, and the tracks of two horses were found at the very place at which the killing took place, and from there to where the body was thrown in the water. These tracks were followed by a drag, and some of the tracks obliterated by the object dragged—evidently the

618    36TH TEXAS CRIMINAL REPORTS.    [*Tyler*,

object which was dragged by the horse was the body of the deceased. The tracks of the horses were of different sizes, one large and the other small. These parties were riding horses whose tracks were of different sizes. This is some corroboration of the accomplice. The witness, Bledsoe, testified to facts so closely connected with this murder, and in such a character as to be cogent corroboration of the accomplice. Besides this, there is also corroborating testimony as to the parties being together in that vicinity, and also with reference to the rope with which the hanging was done as being the rope of appellant. The corroborative proof in this case, in connection with the testimony of the accomplice, shows a most cold-blooded and atrocious murder. The record shows that this murder was committed on the 14th of April, 1896. The body was discovered on the 18th of April, and the arrest of the parties immediately followed. The indictment was procured on the 22nd of April, and this conviction secured on the 28th of April, 1896. We cannot refrain from commending the authorities for their diligence in prosecuting this case to a speedy and successful trial, and in vindicating the law, and bringing the offender to speedy justice. The judgment is affirmed.

*Affirmed.*